```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/5/18
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

M.T.,

                Plaintiff,

-against-

CITY OF NEW YORK, CORIZON HEALTH, INC., CORRECTION OFFICER L. GALAN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, and JOHN DOES 1-10, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES,

                Defendants.

15-cv-6737 (SHS)

OPINION

---

SIDNEY H. STEIN, U.S. District Judge.

    This action pursuant to 42 U.S.C. § 1983 and state law arises out of a rape that allegedly occurred while plaintiff M.T. was an inmate at the Robert N. Davoren Complex ("RNDC") on Rikers Island. The defendants are: the City of New York; Luis Galan, the correction officer who is alleged to have raped plaintiff; and Corizon, Inc. and Corizon Health, Inc. (together, "Corizon"), which operated the RNDC clinic pursuant to a City contract.

    The City seeks summary judgment in its favor dismissing M.T.'s section 1983 claim against the City, and all defendants seek summary judgment on M.T.'s state-law claims.[1] Because the Court finds that a jury could reasonably conclude that municipal policymakers were aware of, and deliberately indifferent to, the inadequacy of their existing policies to deter sexual misconduct, and that M.T.'s injury was a result of their deliberate indifference, defendants' motion is denied as to her section 1983 claim. The

---

[1] All federal claims against Corizon were withdrawn with prejudice by stipulation and order dated October 6, 2016. (Stip. & Order ¶ 1, ECF No. 70.)

motion is also denied as to the intentional tort claim against Officer Galan, and granted as to the remaining state-law claims.[2]

## I. BACKGROUND

The facts presented here are construed – as they must be on a motion for summary judgment – in the light most favorable to M.T., with all inferences drawn in her favor. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017); *Castilla v. City of New York*, No. 09-Cv-5446, 2012 WL 5510910, at *1 (S.D.N.Y. Nov. 14, 2012).

### A. M.T.'s Alleged Rape by Correction Officer Galan

At approximately 2:15 a.m. on December 2, 2012, plaintiff M.T.,[3] then an inmate at RNDC on Rikers Island, was in the RNDC clinic having just been seen by medical staff following an incident with other inmates. (M.T. Dep. 44:1-45:3, ECF No. 67, Ex. E.) The only other people in the clinic at that early hour were two nurses and a correction officer, as well as inmates in a holding cell. (*Id.* 46:6-19.)

While M.T. was in the clinic, Correction Officer Luis Galan arrived and began talking with M.T. and another inmate.[4] After the other inmate left, Officer Galan told M.T. to follow him to a back room. (*Id.* 45:3-19.) Alone in the room with Galan, M.T. made small talk, watched shows on a DVD player, and ate candy provided by Galan. (*Id.* 47:2-25, 48:13-14.)

Eventually, Galan asked M.T. to perform oral sex on him, and M.T. complied. (*Id.* 48:2-9.)

---

[2] The Court delivered its decision from the bench on August 23, 2018, and memorializes the reasons for that decision in this written Opinion.

[3] M.T., who identifies as female, is openly gay and transgender. (Defs.' 56.1 Statement ¶ 1, ECF No. 66; Pl.'s 56.1 Counterstatement ¶ 1, ECF No. 72.)

[4] M.T. had had one prior encounter with Galan: Earlier that year, Galan allegedly leered at M.T. and another inmate while they were in the shower, and M.T. claims Galan gave them soda, money, and tobacco to induce them to agree not to report the incident. (Pl.'s 56.1 Counterstatement ¶¶ 8-9.)

2

When M.T. denied repeated requests for anal sex, Galan told her: "We can do this the easy way or the hard way." Ultimately, M.T. complied. (*Id.* 49:7-50:6.)

When their encounter finished, M.T. left the back room and waited to be escorted out of the medical area. Galan returned, gave M.T. an iPod, charger, and case, and told her not to tell anyone what had happened. (*Id.* 51:12-18.)

M.T. reported to RNDC staff that she had been raped[5] the next day, December 3, 2018, and the matter was immediately referred to the City's Department of Investigation. (*Id.* 55:15-22, 59:25-62:21, 72:2-73:18; Defs.' 56.1 Statement ¶¶ 25-27, ECF No. 66.) It is undisputed that: Galan was never interviewed in the course of the City's investigation of the incident, (Pl.'s 56.1 Counterstatement ¶ 21, ECF No. 72; Defs.' 56.1 Statement ¶ 30); no rape kit was performed on M.T., (M.T. Dep. 61:12-21; Zdrojeski Dep. 65:21-23, ECF No. 61, Ex. E); and video from the camera monitoring the entryway to the clinic was not preserved by the City's Department of Correction (*see generally* Pl.'s Mem. in Supp. of Mot. for Sanctions for Spoliation of Evidence, ECF No. 62; Defs.' Opp'n to Pl.'s Mot. for Spoliation and Sanctions, ECF No. 64).

### B. City Policy With Respect to Staff-Inmate Sexual Misconduct in its Prisons

Pursuant to a 2007 directive of the New York City Department of Correction (DOC), the City has a "zero tolerance policy" with regard to both "inmate-on-inmate and staff-on-inmate sexual abuse and sexual threats." (DOC Directive 5010 on Preventing Inmate Sexual Abuse ("Directive 5010"), May 1, 2007, ECF No. 67, Ex. C; *see* Cussen Dep. 62:4-10, ECF No. 67, Ex. B.) The directive makes all DOC employees mandatory reporters of staff-inmate sexual abuse and advises them that a failure to report will result in disciplinary action. (Defs.' 56.1 Statement ¶¶ 14-15; *see* Directive 5010 at IV.)

---

[5] By New York state statute, *any* sexual intercourse between a correction officer and an inmate is rape, N.Y. Penal Law § 130.25(1), because an inmate is legally incapable of consenting to sex with prison staff, *id.* § 130.05(3)(e)-(f). Any staff-inmate sexual contact short of intercourse is sexual abuse in the second degree for the same reason. *Id.* § 130.60(1).

State and federal law also recognize and seek to eliminate such conduct. Specifically, New York State law provides that inmates are legally incapable of consenting to sexual contact with correction officers, and defines any such contact as sexual abuse or rape. N.Y. Penal Law §§ 130.05(3)(e)-(f), .25(1), .60(1). In addition, Congress enacted the federal Prison Rape Elimination Act (PREA) in 2003 to "establish a zero-tolerance standard for the incidence of prison rape." 34 U.S.C. § 30302(1).

In 2012, the City had a number of policies in place to implement its zero-tolerance policy. At that time, inmates could report allegations of sexual misconduct to DOC staff, medical staff, and to the City's Department of Investigation through a grievance system or via a hotline, assuming that hotline was working. Third-parties could also make allegations on an inmate's behalf. The DOC's Investigation Division was charged with responding daily to all PREA-related allegations. (Defs.' 56.1 Statement ¶¶ 7-10, 14, 24 (citing Cussen Dep. 25:8-21, 58:17-25, 59:4-60:24, 62:4-10).)

Nonetheless, during the period between 2011 and 2012, 3.1 percent of inmates at RNDC responded to a survey by the Bureau of Justice Statistics of the United States Department of Justice that they had been sexually victimized by staff while at RNDC. (Allen J. Beck et al., Bureau of Justice Statistics, NCJ 241399, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* ("DOJ Survey") at 79 (May 2013), ECF No. 73, Ex. B.)[6] This DOJ Survey reported with a 95 percent confidence level that the reports of sexual victimization would be as high as 5.8 percent or as low as 1.6 percent, if different sample RNDC populations were used. (*See id.* at 79, 82 note b.)

In 2014, DOC hired the Moss Group, a consulting firm, to review whether its policies and practices with respect to sexual misconduct complied with the PREA and to recommend improvements. As part of its review, the Moss Group conducted a thorough assessment of the practices at RNDC in 2015 and issued its findings in June of that year. (Moss Group, *Sexual Safety*

---

[6] The DOJ Survey – excerpts of which were submitted as Exhibit B to the Declaration of Philip M. Hines (ECF No. 73) – is broken up into two separate attachments on the docket in this action. For DOJ Survey pages 59 and earlier, *see* ECF No. 73-2; for pages 60 and later, *see* ECF No. 73-3.

...

*Assessment Report* ("Moss Report") at 1, 4 (June 2015), ECF No. 73, Ex. J.)[7] Among the Moss Report's findings was that mechanisms for RNDC inmates to report sexual misconduct did not actually function:

> The climate at RNDC is one of difficulty for anyone attempting to report. The phone methods at the facility for reporting abuse are: 1) a[n] . . . "informant" hotline phone number that is on a continuous busy signal and does not ever go through; 2) a . . . "Hotline" number on the Ombudsman's pamphlet that rings to an answering machine that indicates "the mailbox for [a different number] is unavailable"; 3) a[n] . . . Ombudsman's[] direct number that rings to an answering machine with no message indicating what to do, what to say, who answers it, what will happen upon a report or any indication the inmate has reached the right person; and 4) a "Something to Report" number that rings to the Deputy Warden's office. Many staff thought 311 could be used[,] however, according to IT, it can only be accessed outside RNDC.

(Moss Report 54-55.)

The Moss Report also found that third-party reporting, while available by telephoning 311, was "not publicized." (Moss Report 19; *see also id.* 54 ("[N]o information about . . . how to report abuse was posted [at RNDC].").) Staff and inmates alike lacked confidence in the grievance system, which the Moss Report found was actually "*discouraging* complaints," and also lacked assurances of confidentiality. (Moss Report 17-18, 55 (emphasis added).) With respect to complaints made directly to staff, "both inmates and staff [responded] that they were not confident every allegation would be reported." (Moss Report 55.)

---

[7] The Moss Report – excerpts of which were submitted as Exhibit J to the Declaration of Philip M. Hines (ECF No. 73) – is broken up into six separate attachments on the docket in this action. For Moss Report pages 1-14, *see* ECF No. 73-17; for pages 15-28, *see* ECF No. 73-18; for pages 29-42, *see* ECF No. 73-19; for pages 43-64, *see* ECF No. 73-20; for pages 65-77, *see* ECF No. 73-21; for pages 78-86, *see* ECF No. 73-22.

The Moss Report also found that, despite the existence of DOC's zero-tolerance policy and its mandatory reporting requirements,

> [n]o staff at RNDC were able to articulate either the steps needed to respond to a sexual abuse allegation nor the ways to detect it may be occurring. No staff interviewed were able to adequately describe their duties should they come upon or be told about an allegation. On a tour, no information about the zero-tolerance policy against sexual abuse or harassment or how to report abuse was posted.

(Moss Report 54.)

The Moss Report made a number of additional surprising and disheartening findings about DOC practices generally, including findings concerning investigations of sexual misconduct undertaken by DOC's Investigation Division as follows:

> In a majority of the investigations reviewed, [the investigation] did not contain interviews with all possible witnesses. Many actually did not even contain interviews with the staff involved in the case. Witnesses such as clinical staff, inmates in the area or in the unit, staff nearby, the accused staff, clergy, Legal Aid and others were simply not interviewed at all, so no testimonial evidence could be collected. It was mentioned on site that often, staff would not cooperate with [Investigation Division] interviews, with all asking for union representation and all being given Garrity warnings[8] even if they are not the subject of the investigation. Many reported that even then, with a promise that any statements will not be used against them in a criminal prosecution, they would not speak to [the Investigation Division]. If true, they would be subject to termination or discipline per Investigation Division Directive #7000-R. No mention was made that interviews were attempted

---

[8] *See Garrity v. New Jersey.*, 385 U.S. 493, 500 (1967) (holding that the Fourteenth Amendment "prohibits use in subsequent criminal proceedings of statements [by public employees] obtained under threat of removal from office").

> with these staff and refused, so the conclusion is that they were
> never called to be interviewed. This significant piece of missing
> information taints the conclusions of nearly every investigation
> reviewed. One cannot take an inmate report and never take the
> statement of the accused staff and all other possible witnesses
> and conclude the allegation is unfounded.

(Moss Report 26.)

The record also contains evidence of the City's policies as of 2016, including handbooks and signs advising prisoners of their rights and mandatory PREA training for all DOC staff. (Defs.' 56.1 Statement ¶¶ 11, 13 (citing Cussen Dep. at 61:6-62:3).)

## II. PROCEDURAL HISTORY

M.T. initiated this action for damages in August of 2015 against the City and Officer Galan, as well as Corizon – which, as noted above, operated the RNDC clinic pursuant to a City contract.[9] (Compl. ¶¶ 30-39, ECF No. 1.)

The Complaint asserted claims pursuant to 42 U.S.C. § 1983 for violation of M.T.'s Eighth and Fourteenth Amendment rights against the City ("Federal Claim I") and Officer Galan ("Federal Claim IV"). (Compl. ¶¶ 82-107, 133-39.) It also asserted the following claims pursuant to New York State law: sexual assault and rape against Galan ("State Claim I"); negligence against Corizon ("State Claim II"); negligent hiring, training, supervision, and retention, against Corizon ("State Claim IV"); fraud against Galan ("State Claim VI"); and failure to protect against all defendants ("State Claim VII").[10] (Id. ¶¶ 150-99.)

---

[9] The Complaint further included ten John Doe defendants who were Corizon employees at the RNDC clinic. Plaintiff's counsel confirmed at oral argument that those defendants were never identified or served, and thus are not parties to this action.

[10] The following claims were included in the Complaint but were all subsequently dismissed by stipulation of the parties and are not involved in this motion: (1) Eighth and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983 against Corizon and unnamed Corizon employees; (2) conspiracy against Galan and the Corizon employees; (3) violation of various state statutory and constitutional provisions against Corizon,

7

Following the conclusion of discovery proceedings, defendants moved for partial summary judgment, (Notice of Motion, ECF No. 65), and this action was transferred to this Court's docket.

### III. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants seek summary judgment dismissing the section 1983 claim against New York City as well as the state-law claims against all defendants. (*Id.*) Defendants do not seek summary judgment with respect to the section 1983 claim against Officer Galan.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017); *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 288-89 (S.D.N.Y. 2014), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015); *Castilla v. City of New York*, No. 09-Cv-5446, 2012 WL 5510910, at *4 (S.D.N.Y. Nov. 14, 2012). In ruling on the motion, the court "must 'construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.'" *Centro de la Comunidad Hispana*, 868 F.3d at 109 (alterations omitted) (quoting *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011)); *Garcia*, 43 F. Supp. 3d at 288-89.

However, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of her factual assertions opposing summary judgment. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004)); *Glassman v. City of New York*, No. 10-Cv-2468, 2013 WL 31952, at *3 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 557 F. App'x 97 (2d Cir. 2014).

---

Galan, and the Corizon employees; (4) intentional and negligent infliction of emotional distress against all defendants; and (5) prima facie tort against Galan and the Corizon employees. (Stip. & Order ¶ 2, ECF No. 70.)

8

### A. Municipal Liability Pursuant to 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, any "person" acting under color of law that deprives a citizen of rights secured by the Constitution "shall be liable to the party injured." A municipality such as the City of New York is a "person" that can be held liable pursuant to section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The City, however, is not vicariously liable for the actions of its employees: to succeed in her claim, M.T. must demonstrate that a City custom, policy, or usage was the moving force behind her injury. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997); *Jones v. Town of E. Haven*, 691 F.3d 72, 80-81 (2d Cir. 2012); *Castilla*, 2012 WL 5510910, at *4.

A plaintiff may demonstrate the existence of a policy, custom, or usage in a variety of ways. Of relevance to this case, a municipal policy may be established by showing that the acts of a municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware. *Bd. of Cty. Comm'rs*, 520 U.S. at 404; *Jones*, 691 F.3d at 81. In addition, section 1983 liability may exist based on a municipality's failure to provide its agents with adequate training or supervision. *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

M.T. contends that her rape by Galan was part of a "long-standing, well-reported, widespread practice of sexual victimization at DOC facilities" in 2012.[11] (Pl.'s Mem. in Opp'n ("Opp'n") 5, ECF No. 71; *see* Compl. ¶¶ 93, 97, 98, 101 (alleging a "policy or custom of tolerating and authorizing the type of abuse" M.T. allegedly suffered).) The facts M.T. cites in support of that

---

[11] Although M.T. also asserts a "failure to train" theory of municipal liability, as defendants correctly note, M.T. does not "identify a specific deficiency in the city's training program." She therefore cannot prevail on that theory. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). Defendants also contend, and the Court agrees, that M.T. has not shown that the City failed to adequately screen its employees. (Defs.' Mem. in Supp. ("Mem. in Supp.") 12-14, ECF No. 69.) In any event, M.T. does not address this in her opposition to defendants' motion and has therefore abandoned the argument. *See Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015); *Rodriguez v. Vill. of Ossining*, 918 F. Supp. 2d 230, 242-43 (S.D.N.Y. 2013).

9

contention elucidate a policy of inaction on the part of the City in the face of allegations of sexual abuse at DOC facilities.

In the Second Circuit, a policy of inaction can support a *Monell* claim where the inaction is the result of "deliberate indifference."

> A municipal policy may be pronounced or tacit and reflected in either action or inaction. . . . Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983."

*Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). In this context, deliberate indifference "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'failed to make meaningful efforts to address the risk of harm to plaintiffs.'" *Id.* (alteration and citation omitted) (first quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), then quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)).

The risk that prisoners will be subjected to sexual exploitation by correction guards "is acknowledged in New York state law, which pronounces prisoners categorically incapable of consenting to any sexual activity with guards, and subjects guards to criminal liability for such conduct." *Id.* at 335 (citations omitted) (citing N.Y. Penal Law §§ 130.05(3)(e)-(f), .25(1), .60(1)). Thus,

> [t]he deliberate indifference concern . . . is not with a failure to train prison guards to distinguish between permissible and impermissible sexual contact with prisoners. Nor is it with providing sufficient supervision to ensure that guards make correct choices in this respect. New York affords guards *no* discretion respecting sexual contact with prisoners; the state's proscription of such contact is absolute. Thus, the deliberate indifference concern here is with *the adequacy of defendants' own actions to prevent sexual contact between guards and prisoners*

10

> consistent with their affirmative duty to protect prisoners in their custody.

*Id.* at 336 (second emphasis added).

Accordingly, defendants contend that the City had "appropriate policies and procedures . . . to report, punish, and deter allegations of rape and/or sexual misconduct." (Defs.' Mem. in Supp. ("Mem. in Supp.") 9, ECF No. 69.) In support of this, defendants cite the deposition testimony of the City's Federal Rule of Civil Procedure 30(b)(6) witness, Sean Cussen, Deputy Director of Investigation for the DOC Investigation Division, who was appointed to that position in 2007 in part to help DOC comply with the PREA. (Cussen Dep. 8:4-10, 58:4-13.)

Cussen testified that as of 2012, inmates were able to report allegations of sexual misconduct (1) to DOC staff, (2) to medical staff, (3) through a grievance system, and (4) to the City's Department of Investigation via a hotline – although Cussen was not certain that the hotline worked at that time. (*Id.* 59:4-60:6.) Cussen also testified that as of 2012, DOC accepted third-party allegations of sexual misconduct made by others on an inmate's behalf. (*Id.* 60:7-24.) Cussen also testified that his division responded immediately to all PREA-related allegations "on a daily basis," although it is unclear whether he was describing practices as of 2012 or as of the date of his deposition in 2016. (*Id.* 25:8-21.) Finally, Cussen testified that DOC had in place a zero-tolerance policy with regard to sexual abuse and sexual threats, pursuant to DOC Directive 5010 on Preventing Inmate Sexual Abuse. (*Id.* 62:4-10; *see* Directive 5010.)

In opposition, M.T. points to evidence reflecting other policies and procedures that she asserts are deficient, and also to evidence that places in dispute the very facts relied upon by defendants in their motion.

M.T. relies primarily upon the 2015 "Moss Report" commissioned by DOC and referred to above. The Moss Report assessed DOC's compliance with the PREA, found it wanting, and made recommendations for improving PREA compliance. (Moss Report 43 ("Conclusion and Next Steps").) The Moss Report included a specific assessment of the practices at RNDC with respect to sexual misconduct, (Moss Report at App'x B), based on a visit to RNDC that took place over three days in 2015, (Moss Report 4). M.T. also

11

relies upon the DOJ Survey, also described above, which surveyed sexual victimization in prisons around the country during 2011 and 2012 and reported specific data from RNDC. (DOJ Survey at 79.)

As described earlier, the Moss Report made a number of troubling findings, including that: mechanisms for RNDC inmates to report sexual misconduct were not functional; third-party reporting was not publicized; RNDC staff and inmates alike lacked confidence that complaints made directly to staff or through the grievance system would be pursued or kept confidential; and RNDC staff was generally unfamiliar with both DOC's zero-tolerance directive and their own duties as mandatory reporters. (Moss Report 17-19, 54-55.) Disturbingly, the Moss Report also concluded that many investigations of sexual misconduct undertaken by DOC's Investigation Division "did not even contain interviews with the staff involved in the case. Witnesses . . . were simply not interviewed at all." (*Id.* 26.) As a result, the Moss Report found that nearly every investigation it reviewed was "taint[ed]": "One cannot take an inmate report and never take the statement of the accused staff and all other possible witnesses and conclude the allegation is unfounded." (*Id.*)

The Moss Report creates, at the very least, genuine factual disputes as to "the adequacy of defendants' own actions to prevent sexual contact between guards and prisoners consistent with their affirmative duty to protect prisoners in their custody." *Cash*, 654 F.3d at 336.

Bafflingly, the City's papers are devoid of any argument to the contrary. Instead, the City contends simply that the Court should disregard the Moss Report and its findings because: (1) M.T. cites it for the first time in her opposition papers to defendants' motion and therefore it is not among the "materials in the record" within the meaning of Federal Rule of Civil Procedure 56(c)(1)(a); (2) it was not disclosed to defendants during discovery; and (3) it is inadmissible as a subsequent remedial measure pursuant to Federal Rule of Evidence 407. (Defs.' Mem. in Reply ("Reply") 3-7, ECF No. 76.)

The City's arguments are meritless. As to the first argument, the very purpose of summary judgment is to put into the record the "documents . . . or other materials" that show the existence of a factual dispute. Fed. R. Civ. P.

12

56(c)(1)(A). The cases cited by the City did not arise where a party added facts to the record through opposing summary judgment. Rather, those cases dealt with circumstances where plaintiffs sought to attach new materials in opposition to a motion to *dismiss* where the court cannot look beyond the pleadings.[12] *See* Fed. R. Civ. P. 12(d).

The City's second argument – that the Court should disregard the Moss Report because it was not produced by M.T. in discovery – carries little weight since the report was commissioned by the City itself and was certainly well-known to its policymakers.[13]

As to the third argument, the City is incorrect that a post-event investigation is a subsequent remedial measure precluded by the Federal Rules of Evidence. *See* 2 Weinstein's Federal Evidence § 407.06[1] (2018) ("Post-Event Investigations") ("Post-event tests or reports are generally outside the scope of Rule 407, and thus admissible, on the basis that they are conducted or prepared for the purpose of investigating the cause of the accident, and can rarely be characterized as 'measures' which, if conducted previously, would have reduced the likelihood of the accident. It is only if changes are implemented as a result of the tests that the goal of added safety is furthered; and, even then, it is only evidence of those changes that is

---

[12] *See, e.g., Harte v. Ocwen Fin. Corp.*, No. 13-Cv-5410, 2014 WL 4677120, at *19 (E.D.N.Y. Sept. 19, 2014); *U.S. ex rel. Siegel v. Roche Diagnostics, Corp.*, 988 F. Supp. 2d 341, 343 (E.D.N.Y. 2013). The City also cited cases that dealt with circumstances where plaintiffs (in contexts wholly dissimilar) improperly sought to add new *claims*, which is not the case here. *See Ruskay v. Waddell*, 552 F.2d 392, 397-98 (2d Cir. 1977); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262, 2015 WL 6243526, at *151 (S.D.N.Y. Oct. 20, 2015); *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08-Cv-3669, 2009 WL 2514012, at *4 (S.D.N.Y. Aug. 18, 2009).

[13] *See also* Joseph Ponte, Commissioner, NYC Dep't of Correction, Statement Before the New York City Council (Mar. 10, 2016), https://www1.nyc.gov/site/doc/media/budget_ testimony.page; Dina Simon, Acting First Deputy Comm'r, NYC Dep't of Correction, Statement to the New York City Council (Dec. 15, 2015), https://www1.nyc.gov/assets/ doc/downloads/press-release/FINAL_Women_Issues_Testimony_12_15_15.pdf; *Widespread Failures Found with Rikers Island Response to Sex Abuse*, NYPost.com, June 21, 2016, https://nypost.com/2016/06/21/entrenched-problems-handling-sex-abuse-at-rikers-report-says

13

precluded by the rule."); *see also Westmoreland v. CBS Inc.*, 601 F. Supp. 66, 67-68 (S.D.N.Y. 1984).

Accordingly, the Moss Report is properly considered by the Court on this motion.[14]

The primary shortcoming with respect to the Moss Report is its temporal distance from the events at issue here. *See Outlaw v. City of Hartford*, 884 F.3d 351, 381 (2d Cir. 2018) (finding no error in district court's conclusion that a report was too remote to be probative of policies adopted a decade after the underlying events). M.T. alleges that she was raped in December of 2012 and the Moss Report is based on information collected in early 2015 – slightly more than two years later. However, the evidence permits an inference that the inadequate policies and practices described in the 2015 Moss Report were generally *better* than what they were as of 2012. (*See* Cussen Dep. 58:4-13 ("[DOC] began a conscious effort around [2012-2013] to move towards complete PREA compliancy.").) And surely, the City cannot argue that its policies to prevent prison rape were more robust in 2011-12 than they were in 2015. Furthermore, M.T. cites separate evidence of the state of affairs in December 2012: the DOJ Survey, which indicates with 95% confidence that between 1.6 and 5.8 percent of RNDC inmates reported suffering some type of sexual victimization by staff during the 2011-2012 period. (DOJ Survey 79, 82 note b.)

In *Cash v. County of Erie*, the Second Circuit found that, based on a single prior incident of sexual contact between a prisoner and prison guards, a jury could reasonably conclude that the municipality was on notice that its policies in that area were inadequate. *Cash*, 654 F.3d at 337-38; *see also Kovalchik v. City of New York*, No. 09-Cv-4546, 2014 WL 4652478, at *4, *6 (S.D.N.Y. Sept. 18, 2014); *Castilla v. City of New York*, No. 09-Cv-5446, 2012 WL 5510910, at *5 (S.D.N.Y. Nov. 14, 2012).

---

[14] Although the City also states in passing that the Moss Report is "confidential," (Reply 1), they do not explain the relevance of that information. The Court also notes that the report has been publicly available on the S.D.N.Y. docket since its filing; defendants have not moved to strike or seal it; and the report itself is not marked "confidential."

14

In this case, the Moss Report and the DOJ Study supply substantially more evidence than existed in the *Cash* record. Together, viewed in the light most favorable to M.T., with all inferences drawn in her favor, they demonstrate that 1.6 to 5.8 percent of all prisoners at RNDC alone reported experiencing sexual victimization by staff during 2011 and 2012, and a reasonable juror would be able to conclude that this rate was in large part attributable to the substantial policy deficiencies described in the Moss Report.

Accordingly, the Court finds that a jury could reasonably conclude that the City's policymakers were aware of, and deliberately indifferent to, the inadequacy of their existing policies to deter sexual misconduct, and that M.T.'s injury was a result of their deliberate indifference.[15] *Cash*, 654 F.3d at 336, 339; *see also Bailey v. City of New York*, 79 F. Supp. 3d 424, 439, 454 (E.D.N.Y. 2015) (denying summary judgment on a *Monell* claim because a report or study evinced a municipal policy); *Taylor v. City of New York*, No. 03-Cv-6477, 2006 WL 1699606, at *6 (S.D.N.Y. June 21, 2006) (same).

It is of course possible that defendants' evidence would lead a reasonable juror to find that the City was not deliberately indifferent. Because factual disputes remain as to that issue, the City's motion for summary judgment in its favor on M.T.'s section 1983 claim against the City is denied.

---

[15] The Court observes that M.T. has not identified a specific policy deficiency that, if cured, would have prevented the constitutional violation she allegedly suffered. Defendants do not contend that is fatal to her claim, as they do, correctly, with respect to her failure-to-train theory. (Mem. in Supp. 11 (citing *Amnesty Am.*, 361 F.3d at 129-30).) Nor does the Court believe the Second Circuit imposed any such requirement in *Cash*, although the plaintiff there did identify a specific municipal policy deficiency. *See Cash*, 654 F.3d at 338. Where, as here, the evidence permits a finding that "'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'failed to make meaningful efforts to address the risk of harm to plaintiffs,'" it is not up to the plaintiff, as a matter of law, to recommend improvements. *Cash*, 654 F.3d at 334 (first quoting *Vann*, 72 F.3d at 1049, then quoting *Reynolds*, 506 F.3d at 192); *see also Cash*, 654 F.3d at 336 ("[T]he pattern ordinarily necessary to prove deliberate indifference in the context of a failure-to-train claim does not neatly transfer to this case.").

### B. State-Law Claims

#### 1. *State Claim I: The sexual assault and rape claim against Galan*

Galan contends he is entitled to summary judgment on this claim because M.T. brought it pursuant to New York Penal Law § 130.05(3)(f), and "[t]he vehicle for her allegations are claims under § 1983 or tort law." (Mem. in Supp. 16.)

M.T. explains that her claim is actually brought pursuant to state common law – presumably intentional tort – and that the citation to the penal law in her Complaint was to establish that, as a matter of law, she was legally incapable of consenting to sex with Galan. (Opp'n 13.)

Because Galan agrees that "[t]he vehicle for [M.T.'s] allegations are claims under . . . tort law," (Mem. in Supp. 16), and because he advances no other argument as to why he is entitled to summary judgment on this claim, his motion for summary judgment is denied as to State Claim I.

#### 2. *State Claims II & IV: The negligence claims against Corizon*

M.T. asserts against Corizon a claim of negligence (State Claim II) and a claim of negligent hiring, training, supervision, and retention (State Claim IV).

In order to prevail on either negligence claim, M.T. would have to prove that Corizon knew or reasonably should have known of the risk that prisoners were subject to sexual misconduct in its clinics. *See Qin Chen v. United States*, 494 F. App'x 108, 109 (2d Cir. 2012); *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (a plaintiff must show "the standard elements of negligence" in order to "state a claim for negligent supervision or retention under New York law").

In her Complaint, M.T. alleged that it was a "well-established practice" for correction officers to bring prisoners into the unmonitored clinics, order the staff to leave, and assault the prisoners out of the view of cameras. (Compl. ¶¶ 58-60.) But M.T. has not cited a single fact in her summary judgment papers to support the allegation in the Complaint.

16

M.T.'s statement of undisputed facts contains exactly one fact about Corizon: that it "was the medical provider who collected the rape kits." (Pl.'s 56.1 Counterstatement ¶ 29.) M.T.'s opposition brief cites one additional piece of evidence – her own deposition testimony that there were two Corizon nurses in the clinic at the time of the alleged rape. (Opp'n 14.)

Neither of these facts is probative of whether Corizon should have known of the risk of harm to M.T. before the assault occurred, let alone the "well-established practice" alleged in the Complaint. Accordingly, there is no genuine dispute of material fact as to whether Corizon was negligent, and Corizon's motion for summary judgment is granted as to these claims.

### 3. State Claim VI: The fraud claim against Galan

"Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015). Furthermore, "[c]laims for fraudulent omission require a duty to disclose." *Meda AB v. 3M Co.*, 969 F. Supp. 2d 360, 385 (S.D.N.Y. 2013) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

M.T. alleges that Galan omitted to account for his whereabouts for a five-hour period during which the rape allegedly occurred, and cites as evidence the logbook where, according to M.T., Galan should have recorded his whereabouts during that time. (Opp'n 16; *see* ECF No. 73, Ex. E.)

Although Galan may have had a duty to his employer to keep accurate logs, there is no indication that he had such a duty to M.T. *See Meda AB*, 969 F. Supp. 2d at 385. Accordingly, while this evidence may be relevant to other of M.T.'s claims, it does not support a fraudulent-omission claim.

Because the alleged logbook omission is the only misrepresentation or omission supported by evidence in M.T.'s summary judgment papers, summary judgment is granted with respect to M.T.'s fraud claim.[16]

---

[16] Defendants' alternative argument, that M.T. is barred from asserting this claim because she failed to include it in her notice of claim to the City, is of dubious merit. "Although the notice must set forth the nature of the claim, N.Y. Gen. Mun. Law § 50-e, it need not

17

### 4. *State Claim VII: The failure-to-protect claim against New York City, Corizon, and Galan*

M.T.'s failure-to-protect claim is grounded in a legal theory that may arise where a municipality fails to provide police protection to a citizen despite knowledge that such failure could lead to harm, and the citizen's reliance on assurances that protection would be provided. (Opp'n 17.) *See Mastroianni v. Cty. of Suffolk*, 91 N.Y.2d 198, 204 (1997); *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987). M.T. cites no case applying this state-law failure-to-protect theory beyond that specific fact pattern, and the Court is aware of none. Nor does M.T. even attempt to apply the four elements of such a claim to the facts of her case.[17]

Accordingly, the Court finds no genuine dispute of material fact, and summary judgment is granted in favor of defendants as to M.T.'s failure-to-protect claim under state law.

## IV. CONCLUSION

For the foregoing reasons, defendants' Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. The claims that remain are the 42 U.S.C. § 1983 claims against New York City (Federal Claim I) and Officer Galan (Federal Claim IV), and the intentional tort claim against Galan

---

state a precise cause of action in haec verba." *Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016) (quotation marks omitted) (finding that notice of claim alleging "violation of civil rights; battery; denial of medical care; and negligent screening, hiring, training, supervising and retaining of police officers . . . adequately notified the municipal defendants that [plaintiff] might bring an IIED claim against them" (quotation marks and alteration omitted)).

[17] M.T. also invokes the "state-created danger" doctrine, which can be the basis for a substantive due process claim under federal law. *See Pena v. DePrisco*, 432 F.3d 98, 108 (2d Cir. 2005). However, M.T. has not cited any case applying that doctrine to failure-to-protect claims under New York law, and the Court is, again, aware of none.

(State Claim I). All claims against the Corizon parties having been dismissed, those parties are terminated from this action.

Dated: New York, New York
September 5, 2018

*[signature]*

Sidney H. Stein, U.S.D.J.